# CHARLESTON.

B. F. PERKINS v. MAX L. FRIEDBERG and MARDEN, ORTH & HASTINGS Co. *et al.* .

Submitted January 31, 1922. Decided February 7, 1922.

1. EQUITY—*Amended Bill Held Not Demurrable as Departure.*

Where the original bill is for recovery on a contract for the use of buildings and personal property and for damages arising from their use, agreed to be paid under the terms of the contract, and it is charged therein that defendants negligently and carelessly damaged the property amounting to a

90 W. Va.

sum named; and the bill is amended by making substantially the same averments but omitting the words "carelessly and negligently" as qualifying the word "damaged" and further alleging that defendants promised and agreed to pay for such use as well as any damages resulting from such use; the amended bill is not demurrable as a departure from the cause of action stated in the original bill.     (p. 190).

2.  ATTACHMENT—*Claim for Damages Under Agreement Held Not One Arising Ex Delicto.*

Such a claim is not one arising *ex delicto* and can be asserted against a non-resident defendant by bill in chancery, supported by attachment, under chap. 106 of the Code. (p. 190).

3.  EQUITY—*Demurrer by Nonresident Held Appearance Warranting Personal Decree.*

In a suit in chancery to recover money due under contract against a non-resident defendant in which there is attachment of defendant's property and substituted summons by order of publication, a demurrer to the bill by the non-resident defendant constitutes an appearance on his part and warrants a personal decree against him. (p. 191).

4.  ATTACHMENT—*Bond by Nonresident Defendant Held Substitute for Attached Property.*

Where such appearance is entered, and defendant gives bond to perform the decree of the court, the attachment is dissolved, and the bond becomes a substitute for the attached property; the attachment has served its functions and ceased to be operative, and a subsequent motion to quash the affidavit for attachment and dismiss the bill is properly overruled. (p. 191).

5.  PRINCIPAL AND AGENT—*Relation May be Implied from Words and Conduct of Parties.*

The relation of agency may be implied from the words and conduct of the parties and the circumstances of the particular case, and does not necessarily depend upon an express appointment and acceptance. (p. 192).

Appeal from Circuit Court, Marshall County.

Action by B. F. Perkins against Max L. Friedberg and others and Marden, Orth & Hastings Company. Decree for plaintiff, and defendants last named appeal.

*Affirmed.*

*J. M. Ritz,* and *Rhinelander, Durkin & Perkins,* for appellant.

*John P. Arbenz,* for appellee.

LIVELY, JUDGE:

Defendant, Marden, Orth & Hastings Co., appeals from a decretal judgment against it for $8628.48, entered December 20, 1920.

Plaintiff leased to Max Friedberg a portion of his brewery buildings and certain personal property in the city of Benwood for a term of one year for the purpose of the manufacture of potash from tobacco stems, with power to transfer the lease to a corporation afterwards to be formed, but without releasing Friedberg from liability under its terms. Dr. Peacock, who represented appellant, Marden, Orth & Hastings Co., and who was in its employ as a chemical expert, participated in the negotiations for and formation of the lease contract, but as the financial responsibility of his employers was then unknown to plaintiff he preferred to lease to Friedberg, about whose financial standing he had made satisfactory inquiry. Plaintiff was fully aware at the time of entering into the lease contract that defendant company, appellant, was jointly interested in the business venture to be carried on in his buildings. Friedberg had conceived the plan of extracting potash from tobacco stems, and because of the increased demand for this chemical, induced by the world war, approached M. S. Orth, president of defendant company, who became interested in the proposed venture, and with the result that an agreement was entered into between them by which they, Friedberg and defendant company, agreed to undertake the venture on an equal basis. A corporation was to be formed for the purpose of conducting the business, in which each party was to have equal share and equal control. Dr. Peacock, then in the employ of defendant company as consulting chemist, was to go with the new venture, "loaned" to it, but was to remain in the employ of defendant company. His salary was to be paid by defendant company. He, Peacock, was called into consultation with the parties at the forma-

tion of the agreement, and it was largely on his favorable report after being sent to Wheeling to look into the matter, that defendant company decided to go into the manufacture of potash from tobacco stems. Dr. Peacock accompanied Friedberg to Pittsburg, where the plant was to be located, but not finding the facilities at that point favorable, in the opinion of Peacock, they went to Wheeling, W. Va., where negotiations were begun by them with plaintiff, culminating in the contract lease of the property in Benwood, dated October 11, 1915. In the selection of the property leased and in negotiating the lease, Dr. Peacock states he was representing defendant company, and so informed plaintiff. Plaintiff, as before stated, not then knowing the financial responsibility of Dr. Peacock's principal, preferred to hold Friedberg responsible for the liabilities arising from the business. Because the lease was made to Friedberg instead of to the joint adventurers, a memorandum in writing was then made between Friedberg and Marden, Orth & Hastings Co., Inc., signed by S. Peacock for the latter, stating that the lease had been taken in the name of Friedberg as of that date in order to save time, and that the lease was so taken for the joint account and benefit of both parties, and that the liabilities assumed thereunder should be jointly assumed by them as if the lease had been made to them jointly. This memorandum in writing, so signed, was on the following day mailed to defendant company in a letter from attorney Sachs, in which the terms of the lease were summarized, reasons given for the great advantage offered by the presence of machinery and tanks in the leased premises, and why the lease was taken in Friedberg's name, as contained in copy of the memorandum enclosed. The last clause of that letter reads: "Last evening there was drawn and signed by Dr. Peacock acting for you, and by Mr. Friedberg, a memorandum concerning the lease, a copy of which I am enclosing herewith." Orth, president of defendand company, denied ever having received such letter or memorandum.

Peacock and Friedberg took over the buildings and personal property leased. The former, being a chemical en-

gineer and expert, dictated the change in the arrangement and installation of the machinery, and seemed to have control and supervision of the work of preparation, and, subsequently, of the manufacture of the product. Plaintiff, at his request, furnished money, material and supplies amounting to $1317.00; performed services amounting to $389.52; leased to them other property, the rent on which amounted to $7.53.00. It became necessary to damage the building in the installation of machinery and pipes therein by cutting through the partitions and the like; and it became apparent that the tanks and "agitators" used would be damaged or destroyed by the acids used in the process. These damages, whatever they might be, were agreed to be paid by Peacock on behalf of his employers. The materials, supplies, services, rents and damages are not controverted. The contention is that defendant company is not liable therefor; that if any liability exists it should rest upon the corporation agreed to be formed by Friedberg and defendant company to conduct the enterprise. Potash in some quantities was manufactured and sold to the trade through defendant company, but it soon became apparent that the enterprise would not succeed, a receiver was appointed to take charge of the property, and on April 21, 1916, defendant company purchased from Friedberg all his right, title and interest in the property, and respondent took it over. Whether there was a receiver's sale, it does not appear. In September, 1916, plaintiff instituted this suit against Friedberg and defendant company as traders under the firm name and style of Excelsior Salt Co. and also as Central Productive Company, and attached the property. Defendant company gave bond to answer the decree or judgment of the court, appeared and demurred to the bill, the amended bill and second amended bill; then moved to quash the attachment; then answered, denying liability.

The errors assigned are: (1) Refusal of the court to sustain demurrer to second amended bill, and to dismiss the suit; (2) refusal to quash the attachment affidavit and dismiss the bill; (3) decision of the issue in favor of the plaintiff.

It is argued that a demurrer to the second amended bill should have been sustained because it incorporates a new cause of action not set out in the original bill. The original bill charges that defendant used the property of plaintiff covered by the lease and also other property, and that defendants agreed to pay for the use and damage thereof; that they destroyed and damaged certain property by improper and negligent use thereof, the aggregate damage amounting to the sum of $5000.00. The second amended bill contains practically the same allegation, but more specifically sets out the promise to pay for the damage and how the damage arose, but leaves out the elements of carelessness and negligence in the use by which the damage was occasioned. The allegation is that it became apparent that the use to which certain tanks and "agitators" were put would wholly destroy them, and that plaintiff objected to such use, but defendant specially promised plaintiff that the damage for such use would be paid. We can see no departure from the cause of action in these two bills. The damages were contemplated and agreed to be paid under the terms of the contract, and whether negligently or carelessly done, does not matter so far as the right of recovery of plaintiff is concerned. The terms "negligently and carelessly" so used do not make the claim for damages ex delicto. It arises out of the contract, and we see no objection to uniting it with the items for services, materials, and rent becoming due by virtue of the same transaction. A claim of this character does not fall within the holding in *Mabie* v. *Moore*, 75 W. Va. 761, wherein it is held that a cause of action ex delicto is not alone cognizable in equity under sec. 1, chap. 106 of the Code, authorizing attachments in equity against the property of a non-resident. Damages for a tort are not embraced in that section. But here the claim arises out of the contract sued on, in which there is an express promise to pay these items of damages as alleged in the bill. Another reason urged why the demurrer should have been sustained is that the original and amended bills allege a partnership between Friedberg and defendant corporation, and that the

liability as alleged is a partnership liability, a relation and liability which a corporation cannot enter into nor incur. The weight of authority seems to be that a corporation does not have authority to enter into partnership relations with an individual. However there is nothing to prevent a corporation from becoming interested in a · venture with an individual. The principle urged as a reason why a corporation cannot enter into a general partnership relation is that its act in so doing would be ultra vires, not authorized by its charter. Here there is nothing to show, either in the pleadings or evidence, that the charter of defendant corporation either authorized or prevented such relations, or such ventures. Besides, the bill charges that defendants were acting jointly in the venture and that each is liable for the debts incurred. Where a corporation and another have assumed to enter into a partnership and have jointly transacted business together, they may recover, by reason of their joint interest, upon obligations made to them in their partnership name, although the corporation may have had no power to enter into the partnership. *Wilson* v. *Carter,* 46 W. Va. 469; *French* v. *Donohue,* 29 Minn. 111; *Canal Co.* v. *Fulton Bank,* 7 Wend. (N. Y.) 412. The converse of this proposition should be true. "Where the rights of the public are not involved, a purely private corporation entering into a contract in excess of its powers, and receiving benefits thereunder, is estopped from setting up the defense that it was without power to make it, so far as such estoppel is necessary to. do justice between the parties, unless such contract is in violation of some positive law or well settled rule of public policy." *Chafin* v. *Coal Company,* 85 W. Va. 459.

The second point of error is that the affidavit for attachment should have been quashed because it did not sufficiently show the nature of plaintiff's claim, the attachment discharged and the bill dismissed. We do not think it necessary to inspect the affidavit nor to pass upon its sufficiency. By giving bond to answer the judgment or decree of the court, the defects. in the affidavit, if any, were waived. The motion to quash came too late. The affidavit had served its

purpose, and the bond took the place of the attached property. *Danser* v. *Mallonee*, 77 W. Va. 26; *Franklin* v. *T. H. Lilly Lumber Co.*, 66 W. Va. 164. "When for the purpose of releasing attached property a bond is given to pay the judgment which the attachment plaintiff may thereafter procure against the attached defendant, the principal effect of such bond is to dissolve the attachment and discharge the property from the attachment lien, and the case will then proceed as if originally by summons." 1 Shinn on Attach., sec. 304.

The remaining assignment of error is upon the decision of the court upon the merits in favor of plaintiff. There is no controversy over the justness of the plaintiff's claims for services, materials, rents and damages. The defense is that defendant corporation is not liable; that if any liability exists it is upon the Central Productive Co., a corporation, the formation of which was contemplated in the agreement between Friedberg and defendant corporation, as set forth in their agreement of October 2, 1915, and which was actually formed on October 22, 1915, for the purpose of conducting the joint venture. It is not denied that Peacock contracted the indebtedness sued on, but it is asserted that he was then acting not as defendant corporation's agent, but as the agent of the Central Productive Co.; that he had no authority to act as agent for defendant corporation. In this we cannot agree. While the corporation was chartered and seems to have been organized, it never took charge of the conduct of the business. No stock was ever issued. It did not purchase raw material or any other material for the conduct of the business; the lease was never assigned to it until after these debts were contracted, and the affairs became involved. It is true that shipments of the potash manufactured were made in that name, but to the order of defendant corporation. The existence of the Central Productive Co. was not known by plaintiff until after the indebtedness to him had been incurred. He knew that materials came to the plant consigned to Central Productive Co., and to Excelsior Salt Co., but he testifies that he had no idea that a corporation had been formed. Dr. Peacock

came to him in October, 1915, before any corporation was formed, representing himself to be acting for defendant corporation in securing the lease, remained in active charge and authority, secured his services and material for their benefit, agreed to pay him compensation for destruction of his tanks and damages to his buildings, rented other buildings from him, representing that there were ample funds behind the venture. Peacock evidently was under the impression that he was the representative of defendant corporation. That was his understanding. He knew that a corporation was to be formed and that he was to receive stock in the corporation out of his employer's shares of stock, but never received any. He was not put in charge by the officers of the Central Productive Co., but continued as he began, in the employ of and representing Marden, Orth & Hastings Co. Friedberg testifies that Orth told him that Peacock was to be his representative in the conduct of the business. The parties to the joint venture never seemed to consider the existence of the corporation in their dealings with each other or the public. Mr. Orth took no part in its organization, and did not know who were its officers. No corporation account books were kept so far as the record discloses. Mr. Orth visited the plant in its formative stage and found Peacock in charge as his representative and seemed to be satisfied with its progress. The corporation was a lifeless paper organization and did not awake to activity until in the year 1916, when the lease was transferred to it and a receiver was appointed for its affairs. Freidberg testifies that the corporation formed under his agreement with Marden, Orth & Hastings Co. was never in the conduct of the business until about the time he sold out in 1916; and that the business had been carried on in Perkins' building without any special name, and whatever materials were needed he, himself, bought in his own name; that Mr. Orth was fully advised of this method of procedure, after the date of the formation of the corporation. The preponderance of the evidence is that the business was conducted as it had been begun, with the two defendants equally interested therein, until about the time of the appointment of

the receiver. It is clear that Perkins was not informed of any change. Having created this condition and permitted it to remain, can defendants now escape liability to plaintiff by retreating under protection of this corporation which never functioned?

Under the circumstances detailed we think the lower court was justified in finding that Dr. Peacock was the agent of defendant corporation. The creation of an agency may be deduced from the declarations and acts of the parties and does not depend upon express appointment and acceptance. *Downer* v. *Morrison,* 2 Gratt. 237; 2 C. J. p. 435, sec. 32, title, ''Implied Agency.'' We do not overlook the fact that Mr. Orth, president of the defendant corporation, denies the agency of Dr. Peacock. But upon this conflicting evidence the circuit court has found that such agency existed and we will not disturb its findings in that regard. *Smith* v. *Yoke,* 27 W. Va. 639; *Yoke* v. *Shay,* 47 W. Va. 40; *Naughton* v. *Taylor,* 50 W. Va. 233; *Coal Co.* v. *Coal & Coke Co.,* 83 W. Va. 205.

We affirm the decree.                           *Affirmed.*